**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

UNITED STATES OF AMERICA,

    **Plaintiff,**

           **v.**

JUAN BRAVO-FERNANDEZ [1] and
HECTOR MARTINEZ-MALDONADO [2],

    **Defendants.**

**CIVIL NO.** 10-232 (FAB)

**OPINION AND ORDER**

BESOSA, District Judge.

On March 7, 2011, the jury issued a verdict finding defendant Martinez guilty of conspiracy and federal program bribery, and finding defendant Bravo guilty of conspiracy, a Travel Act violation, and federal program bribery. On March 14, 2011, defendants moved for judgment of acquittal under Rule 29. (Docket Nos. 449 & 450.) On March 21, 2011, the government opposed defendants' motions. (Docket No. 465.)

**BACKGROUND**

The Court will not rehash the entire trial here. Background information or facts will be recounted as needed in the Court's subsequent legal analysis of particular issues. At this stage, the Court provides a general description of the trial proceedings to bring the grounds for acquittal presented by the defendants into a workable perspective. See <u>United States v. Stierhoff</u>, 549 F.3d 19, 21 (1st Cir. 2008). The Court conveys the facts throughout the

opinion in the light most favorable to the verdict.  United States v. Rodriguez-Marrero, 390 F.3d 1, 6 (1st Cir. 2004).

Defendants Juan Bravo-Fernandez ("Bravo") and Hector Martinez-Maldonado ("Martinez") were charged with various crimes related to public corruption.  Count One of the Indictment charged the defendants with conspiring to commit bribery concerning programs receiving federal funds, in violation of 18 U.S.C. § 666, and interstate travel in aid of racketeering, in violation of 18 U.S.C. § 1952.  Counts Two and Three of the Indictment charged defendants Bravo and Martinez, respectively, with interstate travel in aid of racketeering.  Counts Four and Five of the Indictment charged defendants Bravo and Martinez, respectively, with bribery concerning programs receiving federal funds.  Count Six of the Indictment charged defendant Martinez with obstruction of justice. See Docket No. 1.

A jury found defendant Bravo guilty of Counts One, Two, and Four.  See Docket No. 438.  Defendant Martinez was found guilty of Counts One and Five, although Count One was later dismissed without prejudice by the Court.  See Docket Nos. 438 & 569.

**DISCUSSION**

**I.   Legal Standard for Motion for Judgment of Acquittal**

A court may enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction. Fed.R.Crim.P. 29(a).  A defendant may move the court for a judgment

of acquittal after the close of the government's case or at the
close of all the evidence. <u>Id</u>. Courts may reserve their decision
on the motion, submit the case to the jury, and decide upon the
motion before or after the jury returns a verdict of guilty.
Fed.R.Crim.P. 29(b). A defendant may move for a judgment of
acquittal within fourteen days after a guilty verdict or after the
discharge of the jury, whichever is later. Fed.R.Crim.P. 29(c)(1).
Both defendants have timely filed their motions for acquittal.

In reviewing a motion for judgment of acquittal, courts must
consider the evidence "in the light most favorable to the
prosecution" and determine whether the "body of proof, as a whole,
has sufficient bite to ground a reasoned conclusion that the
government proved each of the elements of the charged crime beyond
a reasonable doubt." <u>United States v. Lara</u>, 181 F.3d 183, 200 (1st
Cir. 1999) (citations omitted). This standard requires the
resolution of all evidentiary disputes and credibility questions in
favor of the government; the Court must also draw all reasonable
inferences in favor of the government's case. <u>Id</u>. Thus, the
jury's verdict stands unless the evidence could not have persuaded
a rational trier of fact of the defendants' guilt beyond a
reasonable doubt. <u>United States v. Soler</u>, 275 F.3d 146, 151 (1st
Cir. 2002) (citing <u>Lara</u>, 181 F.3d at 200). The Court assesses only
the admissible evidence at trial in applying the sufficiency

standard.  United States v. Aviles-Colon, 536 F.3d 2, 13 (1st Cir. 2008).

Defendants Bravo and Martinez have separately filed motions for acquittal.  The Court now addresses each defendant's arguments in turn.

## II. Defendant Bravo's Motion for a Judgment of Acquittal on Travel Act Charges

Defendant Bravo alleges that his conviction for Interstate Travel in Aid of Racketeering with an intent to commit bribery in violation of Puerto Rico law cannot stand.  The language of the statute that defendant Bravo was convicted of violating reads, in part, as follows:

> (a)  Whoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to-
>
> (1) distribute the proceeds of any unlawful activity; or
>
> (2) commit any crime of violence to further any unlawful activity; or
>
> (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform-
>
> (A)  an act described in paragraph (1) or (3) shall be fined under this title, imprisoned not more than 5 years, or both; or
>
> (B)  an act described in paragraph (2) shall be fined under this title, imprisoned for not more than 20 years, or both, and if death results shall be imprisoned for any term of years or for life.

18 U.S.C. § 1952.  Defendant Bravo was charged in the indictment with Interstate Travel in Aid of Racketeering in violation of 18 U.S.C. § 666 and Puerto Rico bribery laws, Laws of P.R.Ann.tit. 33 §§ 4360 and 4363.  (Docket No. 1 at 19-20.) Defendant Bravo was found guilty only of interstate travel in aid of racketeering with the intent to bribe in violation of the Puerto Rico laws. (Docket No. 438 at 4.)  He was not found guilty of interstate travel with the intent to bribe concerning programs receiving federal funds.  Id.

Defendant Bravo argues that sections 4360 and 4363 of the Laws of Puerto Rico Annotated "were replaced, effective May 1, 2005, with two different statutes, 33 L.P.R.A. §§ 4890 and 4891, which are differently worded and have different offense elements." (Docket No. 449 at 4.)  Defendant Bravo further argues that the Court instructed the jury as to the offense in section 4890, and the jury convicted him of that offense, which is different from the offense charged in the indictment.  Id. at 5.

The government maintains that although sections 4360 and 4363 were repealed effective May 1, 2005, and defendant Bravo traveled to Las Vegas with de Castro-Font and defendant Martinez on May 13, 2005, the conviction against defendant Bravo can still stand, because defendant Bravo "concocted his corrupt scheme and offered the Vegas trip to de Castro-Font and defendant Martinez . . . before the laws were repealed." (Docket No. 465 at 30.)  While the

law describing the predicate offense of which defendant Bravo was found guilty was repealed prior to his interstate travel, the government argues that defendant Bravo traveled in interstate commerce with the intent to "promote, manage, establish, carry on" the unlawful activity of bribing Senator Jorge de Castro-Font ("de Castro-Font") and defendant Martinez, which had commenced well before the travel occurred and well before the Puerto Rico laws were repealed. See 18 U.S.C. § 1952(a)(3). The government also argues that the evidence at trial sufficiently established that defendant Bravo took numerous actions in support of the unlawful activity after traveling to Las Vegas.

**A.    Traveling with Intent to Promote an Unlawful Activity**

The Court agrees with the government that the evidence at trial showed that defendant Bravo had traveled in interstate commerce on May 13, 2005 with an intent to facilitate the promotion of a scheme to bribe defendant Martinez and de Castro-Font, and that he concocted and began to execute the corrupt scheme well before the travel took place or the predicate laws were repealed, effective May 1, 2005. The government's witness Victor Rivera-Torres ("Rivera") testified that defendant Bravo came to defendant Martinez's Senate office in February and March of 2005 to present two bills which he supported, one regarding security at shopping centers and the other amending the Private Detectives Act, later identified as Senate Projects 410 and 471. (Docket No. 359 at 129-

136.)  Rivera also testified that weeks later, in late March or early April, he witnessed defendant Bravo, defendant Martinez, and de Castro-Font, among others, in defendant Martinez's office discussing a trip to Las Vegas that had already been planned.  Id. at 150-151.  Rivera further testified that defendant Bravo even invited him to fly first class on the trip on that same occasion, but that he declined the invitation.  Id. at 151-152.  Finally, Rivera testified that after defendant Bravo left defendant Martinez's office on that occasion, he (Rivera) told defendant Martinez that "it was not proper for him to accept the trip because there were two projects submitted before the consideration of the commission [which Martinez presided]."  Id. at 153.  Thus, the Court finds that the evidence presented at trial established that defendant Bravo traveled in interstate commerce with an intent to facilitate the promotion of a scheme to bribe defendant Martinez and de Castro-Font that was begun prior to the repeal of sections 4360 and 4363.

### B. Jury Instructions Did Not Constitute Constructive Amendment

Defendant Bravo next argues that his conviction cannot stand because the offense submitted to the jury, and of which he was found guilty, tracked the language of section 4891, the statute that replaced the repealed section 4363, and was therefore not the offense charged in the indictment.  (Docket No. 449 at 5.)  The government claims that the Court instructed the jury based on

section 4363, and thus there was no constructive amendment of the
indictment.

The Court's instruction to the jury as they pertain to
defendant Bravo's Travel Act violation reads, in part, as follows:
"[i]t is a crime in Puerto Rico for anyone to directly or through
an intermediary give or promise to give money or any benefit to a
public officer or employee to perform an act that pertains to
his/her regular duties." (Docket No. 433 at 22) (internal
punctuation omitted). Notably, the language of section 4891 tracks
that of section 4363; except for some minor changes in word
arrangement, the language is nearly identical and the elements
remain essentially the same.[1] Based on the language of the
statutes and a review of the jury instructions, the Court finds
that the jury was instructed as to section 4363 as it related to

---

[1] Repealed Section 4363 reads:

"Every person who directly or through an intermediary
gives or promises to a public officer or employee, juror
or arbitrator or to any other person authorized by law to
hear or decide upon any matter or controversy, or to a
witness, money or any benefit for the purpose provided in
§§ 4360-4362 of this title, shall be punishable by the
imprisonment term provided in the corresponding section."

Section 4891, which replaced section 4363, reads as follows:

"Any person who, directly or through an intermediary,
gives or promises to give money or any benefit to a
public officer or employee, witness, juror, arbitrator,
or any other person authorized by law to hear or decide
any issue or controversy, or to a witness for the
purposes provided in § 4890 of this title, shall incur a
third degree felony."

defendant Bravo's charge under the Travel Act, and thus there was no constructive amendment of the indictment.

   **C.   Commission of Act in Furtherance of Unlawful Activity
        After Travel**

        Defendant Bravo insists that his conviction under section 1952 cannot stand because "any acts which might fulfill the 'thereafter' element of the offense . . . occurred even longer after the repeal [of sections 4360 and 4363]." (Docket No. 470 at 4.) The government maintains that the evidence establishes that defendant Bravo took numerous actions after traveling to Las Vegas in support of the unlawful activity, including "attending the boxing match with de Castro-Font and defendant Martinez, staying at the Mandalay Bay, which defendant Bravo paid for, and treating de Castro-Font and defendant Martinez to a nice dinner." (Docket No. 465 at 32.) The government does not directly address defendant Bravo's argument that those actions all occurred after the Puerto Rico laws which from the basis of defendant Bravo's conviction of interstate travel in aid of racketeering were repealed.

        Under the government's theory of the case, defendant Bravo was appropriately convicted of interstate travel in aid of racketeering in violation of section 4363. Section 4363 was repealed and replaced with section 4891 effective May 1, 2005. The Court has already determined that the travel which occurred on May 13, 2005 was done with an intent to promote an unlawful scheme to bribe defendant Martinez and de Castro-Font that was concocted

well before section 4363 was repealed. The actions which were
taken by defendant Bravo _after_ traveling to Las Vegas to satisfy
the "thereafter" element, however, undisputably all occurred after
May 1, 2005. The government does not attempt to explain how, if
defendant Bravo was appropriately convicted of violating
section 4363, it can be true that the acts meant to fulfill the
"thereafter" requirement of the offense occurred before the repeal
of section 4363. In fact, the Court finds that the acts that
defendant Bravo took to fulfill the "thereafter" requirement all
occurred after May 1, 2005, and therefore, after section 4363 was
effectively repealed. Defendant Bravo cannot be convicted of
conduct that was effectively not a crime at the time the offense
took place. As a result, defendant Bravo's conviction of violating
the Travel Act cannot stand, and his motion for a judgment of
acquittal as to Count Two is **GRANTED.**

## III. Defendant Bravo's Motion for a Judgment of Acquittal on Conspiracy Charges

Defendant Bravo alleges that his conviction for conspiracy to
travel in interstate commerce in aid of racketeering cannot stand
because (a) it was based on an invalid theory of prosecution,
(b) it was not the conspiracy charged in the indictment, and
(c) there was insufficient evidence to support the conviction.

### A.   Invalid Theory of Prosecution

Defendant Bravo's argument that he should be acquitted
because the theories of prosecution underlying the Travel Act

predicates were flawed is not an appropriate argument for a Rule 29 motion.  See United States v. Naegele, 537 F.Supp.2d 36, 40 (D.D.C. 2008) (noting that "[a] Rule 29 motion is not the proper vehicle through which to raise [] legal arguments.")  The Court has found that defendant Bravo's conviction of interstate travel in aid of racketeering in violation of Puerto Rico laws cannot stand; defendant Bravo could conceivably have been convicted of conspiring to travel in interstate commerce in violation of bribery concerning programs receiving federal funds under 18 U.S.C. § 666, however, even though he was not found guilty of that substantive offense. See United States v. Flores-Rivera, 56 F.3d 319, 327 (1st Cir. 1995) (finding that defendant's conviction for conspiracy to import cocaine and possess cocaine with intent to distribute was not inconsistent with acquittal on substantive offense charged in the indictment, because "the substantive crime and the conspiracy to commit it are separate offenses.")

**B.   Conspiracy Charged in the Indictment**

Next, defendant Bravo alleges that he was convicted of a conspiracy which was not the conspiracy charged in the indictment because "any conspiracy relating to interstate travel in aid of bribery was limited in duration to a few months in 2005" and the conspiracy charged in the indictment "was alleged to have lasted from early 2004 through May 2005."  (Docket No. 449 at 24.)  The government responds that defendant Bravo is mistaken regarding his

understanding of the Travel Act, because "the statute does not limit itself temporally to the immediate time period surrounding the interstate travel." (Docket No. 465 at 33.) Notably, defendant Bravo provides no legal support for his claim that his conviction for conspiracy to violate the Travel Act cannot stand because it was part of a "much broader and longer conspiracy" alleged in the indictment. (Docket No. 470 at 17.)

In order to convict defendant Bravo of conspiracy, "the government had to prove that a conspiracy existed, that [Bravo] knew of and voluntarily participated in it, and that an overt act took place in furtherance of it." United States v. Woodward, 149 F.3d 46, 68 (1st Cir. 1998). The indictment charged defendant Bravo with planning a trip to Las Vegas, offering the trip to defendant Martinez and de Castro-Font, traveling from San Juan to Las Vegas, and thereafter taking numerous overt acts in furtherance of the conspiracy, such as paying for limousine service to the hotel from the airport, paying for hotel rooms for defendant Martinez and de Castro-Font, paying for dinner for defendant Martinez and de Castro-Font, and paying for tickets to the Tito Trinidad boxing match. (Docket No. 1 at 13-17.) Additionally, the indictment alleges that defendant Bravo, defendant Martinez and de Castro-Font discussed Senate Projects 410 and 471 during their trip, and, upon returning from the travel to Las Vegas, de Castro-Font scheduled an immediate vote on Senate Project 471, defendant

Martinez issued a report in support of Senate Project 410 through

the Public Safety Committee which he presided, and de Castro-Font,

as Chairman of the Rules and Calendar Committee, scheduled an

immediate vote on Senate Project 410.  Id. at 17-18.

Finally, the Court gave the following jury instructions

regarding conspiracy:

> "For you to find defendants Bravo and Martinez guilty of
> conspiracy, you must be convinced that the Government has
> proven each of the following things beyond a reasonable
> doubt:
>
> First, that the agreement specified in the
> indictment, and not some other agreement or agreements,
> existed between at least two people to -
>
> a. commit bribery concerning federal funds,
> pursuant to 18 U.S.C. § 666
>                     or
> b. travel in interstate commerce in aid of
> racketeering, pursuant to 18 U.S.C. § 1952
>
> Second, that defendants Bravo and Martinez willfully
> joined in that agreement; and
>
> Third, that one of the conspirators (not necessarily
> one of the defendants) committed an overt act during the
> period of the conspiracy in an effort to further the
> purpose of the conspiracy."

(Docket No. 433 at 18.)  Based on the crime alleged in the

indictment, the instructions given to the jury at the close of

trial, and the broad language of the Travel Act, the Court finds

that defendant Bravo was appropriately convicted of the crime

alleged in the indictment.

## C.     Sufficiency of Evidence Supporting Conspiracy

Finally, defendant Bravo claims that his conviction must be vacated because there was insufficient evidence to support that he entered into a conspiratorial agreement with de Castro-Font to violate the Travel Act in furtherance of an unlawful activity and thereafter engaged in an act to further the commission of bribery. To establish the existence of a conspiracy, "the government had to prove beyond a reasonable doubt that each defendant knowingly and voluntarily agreed with others to commit a particular crime.  Such an agreement may be express or tacit, that is, represented by words or actions, and may be proved by direct or circumstantial evidence."  United States v. Rivera-Rodriguez, 617 F.3d 581, 596 (1st Cir. 2010) (quoting United States v. Rivera Calderon, 578 F.3d 78, 88-89 (1st Cir. 2009)).

The evidence at trial showed the following:  that defendant Bravo and de Castro-Font had an agreement under which defendant Bravo consistently provided cash and checks to de Castro-Font from the year 2000 to 2008 through Carlos Diaz-de Hostos (Docket No. 357 at 10-11); that de Castro-Font and defendant Bravo arrived in Las Vegas together and stayed in the same hotel there (Docket No. 357 at 46-47); that defendant Bravo paid for a dinner where de Castro-Font and defendant Martinez were in attendance after having traveled to Las Vegas (Docket No. 357 at 49); that de Castro-Font voted in favor of Senate Project 410 in May of 2005

(Docket No. 391 at 100-101); and that defendant Bravo told an audience at a meeting in 2009 that de Castro-Font was to be thanked for the passage and enactment of the Code of Conduct for Shopping Centers Act, also knows as Senate Project 410 (Docket No. 372 at 58-59). Accordingly, the Court finds "that sufficient evidence was presented at trial for a rational jury to conclude beyond a reasonable doubt" that defendant Bravo entered into a conspiratorial agreement with de Castro-Font to violate the Travel Act in furtherance of an unlawful activity. See <u>Rivera-Rodriguez</u>, 617 F.3d at 597. Defendant's motion for a judgment of acquittal as to his conviction for conspiracy is **DENIED**.

## IV. Defendants' Motion for a Judgment of Acquittal on Section 666 Charges

Defendants Bravo and Martinez request a judgment of acquittal on Counts Four and Five of the Indictment, respectively, which

charged them with violating 18 U.S.C. § 666.[2]  Defendants allege

that the evidence cannot support a conviction on either of the

counts.

    Defendant Bravo alleges that his conviction on Count Four

cannot stand because (1) neither defendant Martinez nor de Castro-

Font were agents of the Commonwealth of Puerto Rico, (2) neither

defendant Martinez nor de Castro-Font were agents of an entity

---

[2] Section 666 provides, in relevant part, as follows:

(a)  Whoever, if the circumstance described in subsection
(b) of this section exists--

    (1)  being an agent of an organization, or of a
State, local, or Indian tribal government, or any agency
thereof-

        (B)  corruptly solicits or demands for the
benefit of any person, or accepts or agrees to accept,
anything of value from any person, intending to be
influenced or rewarded in connection with any business,
transaction, or series of transactions of such
organization, government, or agency involving any thing
of value of $5,000 or more; or

        (2)  corruptly gives, offers, or agrees to give
anything of value to any person, with intent to influence
or reward an agent of an organization or of a State,
local or Indian tribal government, or any agency thereof,
in connection with any business, transaction, or series
of transactions of such organization, government, or
agency involving anything of value of $5,000 or more;
shall be fined under this title, imprisoned not more than
10 years, or both.

(b)  The circumstance referred to in subsection (a) of
this section is that the organization, government, or
agency receives, in any one year period, benefits in
excess of $10,000 under a Federal program involving a
grant, contract, subsidy, loan, guarantee, insurance, or
other form of Federal assistance.  18 U.S.C. § 666.

receiving more than $10,000 a year in federal assistance, (3) the transactions at issue were not valued at more than $5,000, (4) defendant Bravo did not provide any expenses for the Las Vegas trip "corruptly", and (5) Count Four was submitted to the jury on a legally invalid gratuities theory. (Docket No. 449 at 11-12.) Defendant Martinez makes similar allegations in his motion for judgment of acquittal on Count Five, stating that an acquittal is required because (1) defendant Martinez had no control over federal funds, (2) the charged bribery was not made "in connection with" a transaction of the Puerto Rico Department of Education or Treasury, (3) the transaction was not worth more than $5,000, and (4) the government improperly shifted its basis for conviction from a bribery theory to a gratuities theory.

The Court provided the following jury instructions regarding bribery concerning programs receiving federal funds for defendant Bravo:

> First, that defendant Bravo gave, offered, or agreed to give any thing of value to any person;
>
> Second, that defendant Bravo did so corruptly with the intent to influence or reward an agent of the Puerto Rico government in connection with any business, transaction, or series of transactions of the Puerto Rico government;
>
> Third, that this business, transaction, or series of transactions involved any thing of a value of $5,000 or more; and
>
> Fourth, that the Puerto Rico government, in a one-year period preceding May 15, 2005, or during the one-year period following May 15, 2005, received benefits of more than $10,000 under any Federal program involving a grant,

> contract subsidy, loan, guarantee, insurance or other
> assistance.

With respect to defendant Martinez, the Court instructed the jury

in the following way:

> First, that defendant Martinez was an agent of the
> Commonwealth of Puerto Rico government whose duties
> included those of an elected Senator of the Commonwealth
> of Puerto Rico, as charged;
>
> Second, that defendant Martinez solicited, demanded,
> accepted or agreed to accept any thing of value from
> another person;
>
> Third, that defendant Martinez did so corruptly with the
> intent to be influenced or rewarded in connection with
> some business, transaction or series of transactions of
> the Puerto Rico government;
>
> Fourth, that this business, transaction or series of
> transactions involved any thing of a value of $5,000 or
> more; and
>
> Fifth, that the Puerto Rico government, in a one-year
> period preceding May 15, 2005, or during the one-year
> period following May 15, 2005, received benefits of more
> than $10,000 under any Federal program involving a grant,
> contract subsidy, loan, guarantee, insurance or other
> assistance.

Because most of defendants' allegations are overlapping, the Court

addresses them simultaneously.

## A.   Defendant Martinez and de Castro-Font are Agents of the Commonwealth of Puerto Rico

Defendants argue that the evidence produced at trial did

not establish that defendant Martinez and de Castro-Font were

agents of Commonwealth of Puerto Rico.  The statute requires the

government to show that defendant Martinez was "an agent of an

organization, or of a State, local, or Indian tribal government, or

any agency thereof [who] . . . corruptly solicit[ed] or demand[ed]
for the benefit of any person, or accept[ed] or agree[d] to accept,
anything of value from any person, intending to be influenced or
rewarded in connection with any business, transaction, or series of
transactions of such organization, government, or agency involving
any thing of value of $5,000 or more." 18 U.S.C. § 666(a)(1). The
term "agent" is defined in section 666 as "a person authorized to
act on behalf of another person or a government and, in the case of
an organization or government, includes a servant or employee, and
a partner, director, officer, manager, and representative."
18 U.S.C. § 666(d)(1). Further, the statute defines "state" as "a
State of the United States, the District of Columbia, and any
commonwealth, territory, or possession of the United States."
18 U.S.C. § 666(d)(4). Defendant Bravo was convicted under
subsection (a)(2) of the statute, which prohibits any person from
"corruptly giv[ing], offer[ing], or agree[ing] to give anything of
value to any person, with intent to influence or reward an agent of
an organization or of a State, local or Indian tribal government,
or any agency thereof, in connection with any business,
transaction, or series of transactions of such organization,
government, or agency involving anything of value of $5,000 or
more." 18 U.S.C. § 666(a)(2).

It was an uncontested fact at trial that defendant
Martinez and de Castro-Font were elected members of the Puerto Rico

Senate, and thus, under a straightforward reading of the statute, were agents of the Commonwealth of Puerto Rico.  As the Supreme Court stated in <u>Salinas v. United States</u>, "§ 666(a)(1)(B) was designed to extend federal bribery prohibitions to bribes offered to state and local officials employed by agencies receiving federal funds."  522 U.S. 52, 58 (1997).  A plain reading of the statute and language in Supreme Court jurisprudence demonstrates that Martinez and de Castro-Font were "agents" of the legislative branch, in that they were "authorized to act on behalf of . . . a government."  18 U.S.C. § 666(d)(1) (stating that "in the case of an organization or government, includes . . . a representative.")  The Fifth Circuit Court of Appeals in <u>United States v. Lipscomb</u> also engaged in a detailed analysis regarding the reach of section 666 and noted that "Congress clearly sought to apply § 666 to legislative-branch officials."  299 F.3d 303, 333 (5th Cir. 2002).

          Defendants rely primarily on two cases, neither of which have any binding authority on this Court, for the proposition that Martinez and de Castro-Font are not agents under section 666.  <u>See</u> <u>United States v. Phillips</u>, 219 F.3d 404 (5th Cir. 2000); <u>United States v. Sunia</u>, 643 F.Supp.2d 51 (D.D.C. 2009).  Notably, these cases are inapposite to the question of whether defendant Martinez and de Castro-Font can be considered agents under section 666 because they both address the issue of agency under a different subsection of the statute.  Defendants Martinez and Bravo were

charged with and convicted of violating sections 666(a)(1)(B) and 666(a)(2), respectively.  The defendants in <u>Phillips</u> and <u>Sunia</u>, meanwhile, were both charged with violating section 666(a)(1)(A), which requires that the "agent of an organization, or of a State, local or Indian tribal government, or any agency thereof embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that is valued at $5,000 or more, *and is owned by, or is under the care, custody, or control of such organization, government, or agency*."  (emphasis added).

        In <u>Phillips</u>, the Fifth Circuit Court of Appeals found that the defendant, a tax assessor for a Louisiana parish that received federal funds through food stamps provided to parish residents, was not an "agent" of the parish under section 666 because the tax assessor was not "authorized to act on behalf of the parish with respect to its funds."  219 F.3d at 411.  In so finding, the court determined that the tax "assessor's duties are set forth by state, not parish, law", "the activities of the assessor are supervised by . . . a state board controlled by state officials, the assessor's salary is not set by the parish, the salary is not paid for by the parish, and the assessor received no employee benefits from the parish."  <u>Id</u>. at 412.  The <u>Phillips</u> court further noted that the tax assessor had no "ability to control or administer employees or programs or funds of the

parish", nor could the assessor's office "have affected the integrity of the food stamp program." Id. n. 13.

In Sunia, the District Court for the District of Columbia adopted the Philips test and found that the defendants, former counsel to American Samoa's legislative body and former members of the legislative body, "should not be viewed as agents of the American Samoa Departments of Treasury or Education for the duration of employment by the legislative branch" because the government could not show that "the American Samoa Departments of Treasury or Education had any 'power, authority, or control over the [defendants'] duties' as employees of the Fono [the territory's legislative body], or that defendants' salary or benefits were determined by those agencies." Sunia, 643 F.supp.2d at 65. The Sunia court also engaged in a convoluted discussion of statutory interpretation and determined that for the purposes of 666(a)(1)(A), "the term 'government' must be interpreted to refer to such an entity only insofar as that entity is holding federal funds at the 'executive, legislative, or judicial' level . . . and not insofar as the funds are being held by a subdivision of those entities." Id. at 62-63 (internal punctuation omitted). This Court disagrees with the Sunia court's interpretation as a matter of law; because the Sunia court's discussion was limited for the "purposes of §666(a)(1)(A)", where the issue was "whether the indictment properly alleges that the defendants were agents of the

'organization, government, or agency' in whose 'care, custody, or control' the property at issue here resided", however, the Court need not distinguish the Sunia case any further. See id. at 62-63.

Finally, both the Phillips and Sunia courts make reference to a requirement of "some nexus between the criminal conduct alleged and the agency receiving federal assistance" in order for section 666 to apply. Sunia, 643 F.Supp.2d at 64 (quoting Phillips, 219 F.3d at 413-14). Defendants Bravo and Martinez urge the Court to take note of this requirement, even though the Phillips and Sunia decisions are based on a different subset of section 666. See 18 U.S.C. §666 (a)(1)(A)(ii). The cases relied on by defendants are inapposite and do not require this Court to impose any "nexus" requirement between the offense conduct and the federal funds. In fact, the Supreme Court has expressly declined to apply this kind of "nexus" requirement to section 666. See Salinas, 522 U.S. at 59 ("We need not consider whether [section 666] requires some other kind of connection between a bribe and the expenditure of federal funds . . . .").

Furthermore, the Lipscomb court, which found that defendant, a Dallas City Council Member, was appropriately convicted under section 666, rejected an argument similar to the one made by defendants here. The defendant in Lipscomb proposed that the court narrowly construe section 666 not to prohibit an activity "not directly related to federal spending or federally

funded programs." 299 F.3d at 309. The <u>Lipscomb</u> court rejected this view, noting that the defendant's proposal would require the court "to ignore our consistently broad interpretation of § 666 as targeting corruption *qua* corruption." 299 F.3d 303, 309 (5th Cir. 2002). The <u>Lipscomb</u> court further affirmed the "plain and unambiguous" language of the statute, expressing that "when a local government agency receives an annual benefit of more than $10,000 under a federal assistance program, its agents are governed by the statute, and an agent violates subsection (b) when he engages in the prohibited conduct 'in *any* transaction or matter or series of transactions or matters involving $5,000 or more concerning the affairs of' the local government agency." <u>Id</u>. at 310 (quoting section 666) (emphasis original). For the reasons stated, the Court finds that defendant Martinez and de Castro-Font are "agents" within the meaning of section 666.

### B. The Commonwealth of Puerto Rico and the Senate of Puerto Rico Received Over $10,000 in Federal Benefits

The government provided evidence at trial, through the testimony of Migdalia Bonilla ("Bonilla") and supporting documentation, that the Commonwealth of Puerto Rico received more than $10,000 in federal funding for fiscal years 2004, 2005, and 2006. (Docket No. 391 at 8.) Specifically, the evidence stated that "[r]esources originating from contributions of the United States, constitute a significant part of the total Commonwealth of Puerto Rico resources. Consolidated resources of federal

contributions for fiscal year 2005 are estimated in $4,768.7 million." (Gov't. Exhibit No. 67 at 18.)

Defendants argue that "the Puerto Rico Senate was not the entity that received the federal funds." (Docket No. 449 at 13.) Testimony from government witness Rosemary Pedrero ("Pedrero"), employee of the Treasury Department of Puerto Rico, however, established that the Senate of Puerto Rico childcare program (known as the Food Program for the Care of Children and Adults) receives funding from the Government of the United States. (Docket No. 391 at 19-21.) Pedrero testified that the Senate of Puerto Rico receives the funds through a contract with the Department of Education, which received the funds from the federal government. Id. at 22-23. The money is held in an account at the Treasury Department. Id. at 21. Pedrero also testified, and supporting documentation presented at trial showed, that the Senate of Puerto Rico's application to participate in the childcare food program was approved for the fiscal years 2004, 2005, and 2006, and the Senate was estimated to receive approximately $20,000[3] for the program for

---

[3] For the year 2003-2004, the Puerto Rico Senate was estimated to receive $22,062 for expenses of food services. Gov't. Exhibit 64. For the year 2004-2005, the Food Program was estimated to receive $22,069. Gov't. Exhibit 65. For the year 2005-2006, the Food Program was estimated to receive $20,000. Id.

each of those three years.[4]  Id. at 23-25; Gov't. Exhibits 64 & 65.

The federal assistance received by the Senate of Puerto Rico for

childcare program clearly qualifies as a "benefit" provided under

a federal program.   Thus, the Senate of Puerto Rico received

"benefits in excess of $10,000 under a Federal program", as

required by section 666.

          Defendants allege that the aforementioned funds were not

part of a Senate program because "there was no evidence that either

defendant Martinez or de Castro-Font could or did exercise any

authority or control" over the childcare program.  (Docket No. 449

at 13.)  Defendants cite to no other cases besides Phillips and

Sunia for this proposition, which, as previously mentioned, are

inapposite because the defendants in those cases were charged with

violating a different subsection of section 666.  Moreover, the

Supreme Court has been clear in stating that the reach of

section 666 is "expansive, both as to the conduct forbidden and the

entities covered", reading the statute to reflect Congress's

"expansive, unambiguous intent to ensure the integrity of

organizations participating in federal assistance programs."

Fischer v. United States, 529 U.S. 667, 678 (2000).

---

[4] The evidence presented by the government at trial showed
that the Puerto Rico Senate was "estimated" to receive the federal
funds for the Food Program for the Care of Children and Adults.
The evidence stated that "[t]he reimbursement amount received
monthly will depend on the total of rations served to eligible
children in the centers."  Gov't. Exhibits 64 & 65.

Even under the defendants' interpretation of the requirements of section 666, however, the Court would still conclude that the evidence showed a "sufficient linkage" between defendant Martinez's conduct and the federal funds received by the Senate of Puerto Rico. 299 F.3d at 309. Specifically, the government offered evidence at trial demonstrating that defendant Martinez and de Castro-Font, as agents of the Senate of Puerto Rico, did in fact exercise control and authority over federal funding requests, because they had the responsibility to vote on and approve the Commonwealth budget. (Docket No. 391 at 17); see also United States v. Lipscomb, 299 F.3d at 308 (finding jurisdictional elements of section 666 to be met where defendant was a city council member and "[t]he Council as a whole thus controlled – and individual council members influenced – the City's applications for, and receipt and expenditure of, at least forty million federal dollars each year.") The government has a legitimate federal interest in protecting the integrity of federal funds that have been allocated for state use. As the Lipscomb court noted, "[a] corrupt state or city official who has real responsibility for, or often participates in, the allocation of federal funds is a "threat to the integrity" of those funds, even if they are not actually or directly infected by his corruption." 299 F.3d at 333. The Court finds that the government satisfied its burden of showing that the Commonwealth of Puerto Rico received

substantial federal funds, and in particular, that the Senate of Puerto Rico received over $10,000 in benefits under a Federal program over a one year period.

C.   **The Bribe from Bravo to defendant Martinez and to de Castro-Font Was Intended to Influence or Reward Them "In Connection With" the "Business" of the Senate of Puerto Rico and Involved A "Thing of Value of $5,000 or More"**

Defendants argue that the bribe offered by defendant Bravo and accepted by defendant Martinez was not made "in connection with" the business of the government or agency that received federal funds.  (Docket Nos. 449 at 15-18; 450 at 6-9.) Defendants maintain that this Court should follow the decision of the Fifth Circuit Court of Appeals in United States v. Whitfield, which held that state judges who were "agents" of the Mississippi Administrative Office of the Courts (AOC) - whose purpose is to "assist in the efficient administration of the *nonjudicial* business of the courts of the state" - could not be held liable under section 666 for accepting bribes to make certain decisions in cases before them because the judges' role as agents of the AOC "had nothing to with their capacity as judicial decisionmakers."  590 F.3d 325, 346 (5th Cir. 2009) (emphasis original).  As defendant Bravo admits, the government presented evidence at trial establishing that defendant Bravo offered to defendant Martinez and de Castro-Font a trip to Las Vegas, luxury accommodations, expensive meals, and tickets to a high-profile boxing match. (Docket No. 449 at 16-17.)   In connection with this bribe,

defendant Martinez used his influence and power as a Senator and Chair of the Public Safety Committee to support legislation favoring defendant Bravo's business interests, including voting in favor of the legislation, fast-tracking the legislation within the committee he chaired, and issuing a positive committee report in favor of the legislation.  (Docket No. 391 at 96, 100); see also Lipscomb, 299 F.3d at 331 (noting that the defendant city councilman "used many of the tools at the disposal of a Council member – his vote, his oversight authority, his agenda-setting power, and his other parliamentary privileges – to support policies favorable" to the business that provided him with cash bribes.) Thus, unlike United States v. Whitfield, a direct connection does exist between the bribe offered by defendant Bravo and accepted by defendant Martinez and the transactions and business of the Senate of Puerto Rico, the government agency which, as discussed above, has received over $10,000 in federal benefits.

Defendant Martinez argues that the passing of Senate legislation cannot be considered "business" or a "transaction" under section 666.  (Docket No. 450 at 7.)  Although the statute itself does not define the terms "transaction" or "business", the Supreme Court, in analyzing a claim under section 666, has advised courts to refrain from imposing a "narrowing construction" of the business or transaction clause, notably because it is prefaced by the word "any".  Salinas v. United States, 522 U.S. 52, 57 (1997)

(holding in part that a bribe need not affect federal funds to
violate the federal bribery statute).   The Salinas court makes
numerous references to the statute's "expansive, unqualified
language, both as to the bribes forbidden and the entities covered"
and the "broad definition of the 'circumstances' to which the
statute applies." Id. at 57-58.  Indeed, the primary "business" of
a legislature is the passing of legislation – if the Court were to
heed defendant Martinez's interpretation, it would follow that no
local legislator could be held accountable for corrupt acts under
section 666.   Thus, as agents of the Commonwealth of Puerto Rico
and the Senate of Puerto Rico, defendant Martinez and de Castro-
Font had authority to engage in the "business" of the Senate –
namely, the business of passing legislation, and in this case,
passing legislation that would benefit defendant Bravo.

        Finally, both defendants maintain that the government
failed to prove a transaction worth more than $5,000.   (Docket
Nos. 449 at 16; 450 at 9.)  Defendants allege that the value of the
bribe paid to defendant Martinez and de Castro-Font by defendant
Bravo did not exceed $5,000.  (Docket Nos. 449 at 16-17; 450 at
10.)  The government presented evidence at trial on the theory that
the value of Senate Projects 410 and 471 were worth more than
$5,000 to defendant Bravo.  (Docket No. 465 at 17-18.)  The circuit
courts are split on how the $5,000 element is to be measured; the
government's method has been adopted, however, by at least the

Eleventh Circuit and the Eighth Circuit Courts of Appeals.  See
United States v. McNair, 605 F.3d 1152, 1186 (11th Cir. 2010) ("The
$5,000 in § 666(a)(1)(B) and (a)(2) refers to the value of the
'business, transaction, or series of transactions,' not the value
of the bribe"); United States v. Zimmermann, 509 F.3d 920, 927 (8th
Cir. 2007) (concluding that a benefit of more than $5,000 to the
bribe giver based on the value of the transaction was sufficient
for a section 666(a)(1)(B) conviction)).  Even the Supreme Court
has alluded to the fact that the $5,000 element refers to the value
of the business or transaction, not necessarily the value of the
bribe.  See Salinas v. United States, 522 U.S. 52, 57 (1997)
("Subject to the $5,000 threshold for the business or transaction
in question, the statute forbids acceptance of a bribe by a covered
official who intends 'to be influenced or rewarded in connection
with any business . . . of the defined organization, government, or
agency.'") (internal citations and punctuation omitted).  The plain
meaning of the statute covers "anything of value" and thus includes
transactions involving intangible items.  See United States v.
Marmolejo, 89 F.3d 1185, 1191-92 (5th Cir. 1996) (holding that the
plain meaning of section 666 "includes transactions involving
intangible items, such as the conjugal visits at issue in this
case.")  Additionally, the primary rationale behind the $5,000
restriction in section 666 was based upon Congress's intent to
limit the application of the statute to "only the most serious

instances of governmental corruption." <u>United States v. Mills</u>, 140

F.3d 630, 632 (6th Cir. 1998).  In order to satisfy the $5,000

element, the government presented testimony of two individuals,

Miguel Portilla ("Portilla") and Nestor Medina ("Medina"), the

president of Capitol Security and the general manager of Loomis

Puerto Rico, respectively, two private security companies in Puerto

Rico, to support the proposition that the legislation supported by

defendant Martinez would have been worth millions of dollars to

defendant Bravo and his company, Ranger American.  (Docket No. 372

at 29-47; 139-152.)

        Portilla testified that the passage of Senate Project

471, which proposed an amendment to Law 108, would have benefitted

Ranger American by eliminating Brinks and Loomis Fargo, the only

two other companies engaged in the armored car protection business

at that time, thereby effectively giving Ranger American a monopoly

in the armored car business in Puerto Rico.  (Docket No. 372 at 44-

46 (testifying that if the change to Law 108 were passed, Brinks

and Loomis Fargo "would have to close down", thus benefitting Juan

Bravo and Ranger American.))  Medina, the former general manager of

Loomis Puerto Rico and a business competitor Ranger American in the

industry of armored truck and security companies, testified that in

2004, "Ranger American covered approximately 52 percent of the

market", that "Loomis had approximately 35 percent of the market",

and that Brinks had the other 15 percent of the market.  <u>Id</u>.

at 141-143.  Medina also testified that in 2005, Loomis Puerto Rico
made $12 millions in gross revenue and $1.5 million in net revenue.
Id. at 150-151.  He further testified that if Loomis were out of
the market, there would be an extra $1.5 million dollars of profit
for other armored car companies.  Id.  Thus, the government
provided sufficient evidence at trial for a reasonable jury to
conclude that Senate Project 471, which proposed an amendment to
Law 108, would have been worth far more than $5,000 to defendant
Bravo and his company, Ranger American.  The Court finds that the
$5,000 element of section 666 has been adequately satisfied.

　　　　Recently, the defendants filed a motion for judicial
notice asking the Court to recognize a recent decision by the
Puerto Rico Court of Appeals, in which it found that Law 108
"required a corporation's principal executive officer to have a
detective license."  (Docket No. 580 at 1-2.)  Defendants argue
that this decision is relevant to the issue of "value" before the
Court, in that it interpreted Law 108 already to require the "heads
of security firms to have private licenses", which meant that
Senate Project 471 would not amend Law 108 in that respect, thereby
implying that Loomis (and Brinks) would not have suffered any
additional loss as a result of the passage of Senate Project 471
than it would have under Law 108. (Docket Nos. 580 & 587) (Asking
the Court to conclude "that a jury finding of value under the above
erroneous premise – the requirements intended to be introduced into

Law 108 through Senate Project 471 – as proffered by the government cannot be sustained.") The government, in its response to defendant's motion, alleges that while defendants present their motion as one of judicial notice of law, it is in fact a motion for judicial notice of fact, "namely, the meaning of Law 108 and, consequently, the defendants' intent in seeking to pass S.P. 471." (Docket No. 586 at 1-2.) Furthermore, the government maintains that the judgment of the Puerto Rico Court of Appeals, in resolving the meaning of Law 108, is not relevant to the issue of value or the defendants' intent in passing Senate Project 471. (Docket No. 586.)

The Court agrees with the government's view of defendants' motion for several reasons, and finds that the judicial decision is not relevant to the value of the legislation to defendant Bravo. The Puerto Rico Court of Appeals decision affirmed the Superior Court's interpretation of the term "principal executive officer" within Law 108, a term that had an admittedly ambiguous meaning within the context of the law. See Docket No. 372 at 125-126 (Portilla explaining at trial that "Law 108 is not clear", which was why there were a number of efforts by Portilla and defendant Bravo to amend the law.) Portilla testified that he and defendant Bravo had been working to obtain a change to Law 108 since the year 2000, and had "even once hired a lobbyist to help us at the legislature, to try to amend the law." Id. at 46-47.

Portilla also testified on cross-examination that defendant Bravo
had filed a legal complaint against Loomis Fargo, alleging that
Loomis was in violation of Law 108 because the person who ran
Loomis did not have a private detective license, but in fact, only
an employee of Loomis held the license.  Id. at 90.  During trial,
the Court denied defendants' request to introduce evidence of the
decision of the Superior Court, in which the court revoked Loomis's
license for operating security agencies, finding that it had been
granted illegally by the Police of Puerto Rico.  Id. at 184-185.
The Court maintains its position now, finding that the judgment of
the Puerto Rico Court of Appeals, affirming the decision of the
Superior Court, is not relevant to and does not alter the finding
of value with respect to the worth of the legislation to defendant
Bravo and his company.  In fact, the evidence presented at trial
only serves to bolster the allegation that defendant Bravo had a
great interest in either amending Law 108 through legislative
efforts or challenging the status quo interpretation of Law 108 in
the courts to reflect the meaning of "principal executive officer"
that he favored, so that his competitors would be forced out of
business, and he would gain a monopoly on the armored car business.
The government presented further evidence of defendant Bravo's
motive to maintain control of the industry by soliciting testimony
from Portilla that showed that defendant Bravo opposed Portilla's
business plans to expand his company into the armored car business

in 2008 even though Portilla's company was in compliance with the
law, by opposing his request to the Public Service Commission for
a license to operate additional armored trucks, by appealing to the
Appeals Court, and ultimately appealing to the Supreme Court, where
Portilla's permit to operate additional armored trucks was
ultimately upheld.  Id. at 48-56; 102-105; 123.  For the reasons
mentioned, the Court finds that sufficient evidence was presented
at trial for the jury to find that the passage of Senate Project
471 was valued at more than $5,000 by defendant Bravo, and that the
recent judgment by the Puerto Rico Court of Appeals has no bearing
on this issue.

**D.    Defendants' Acted with Corrupt Intent and Were Properly
        Convicted of Violating Section 666**

        As a final matter, defendants argue that the government
failed to prove that defendants acted "corruptly" with respect to
the Las Vegas trip and that the jury convicted defendants on an
improper "gratuities" theory.  (Docket Nos. 449 at 19 & 450 at 10.)
The Court reiterates the "heavy burden" that defendants bear in
order to prevail on a Rule 29 motion:  they must demonstrate "that
no reasonable jury could have found [them] guilty beyond a
reasonable doubt."  United States v. Munoz, 36 F.3d 1229, 1234 (1st
Cir. 2004) (citations omitted).  In other words, "[w]here
reasonable minds could differ as to whether the prosecution proved
the defendant's guilt beyond a reasonable doubt, the jury's verdict

must be upheld." <u>United States v. Lin</u>, No. 09-cr-183-01, 2010 WL
1957274, at *1 (D.N.H. May 14, 2010.)

Defendant Bravo alleges that the government's evidence
that he acted "corruptly" with respect to the Las Vegas trip "does
not rise above the level of speculation", because the evidence
showed that defendant Martinez "supported both bills well before
there was any talk of a trip to Las Vegas" and "Carlos Diaz
testified that there was no conversation regarding the legislation
at the dinner [in Las Vegas] or at any other time in his presence."
(Docket No. 449 at 19.)  Defendant Bravo provides record citations
for the evidence described, but makes a number of other assertions
that contain no cites to the evidentiary record.  <u>See</u> <u>United States
v. Zambrana</u>, No. 2:00 CR 28 TS, 2005 WL 1799525, at *3 (N.D.Ind.
Jul. 26, 2005) ("The Defendant's conclusory allegations that the
government's evidence was insufficient to support the jury's guilty
verdicts fails to meet the 'very heavy burden' for a Rule 29
motion.") (citations omitted).

The government maintains that the defendants' corrupt
intent was established by circumstantial evidence, including the
timing of the Las Vegas trip and the timing of official acts taken
by defendant Martinez regarding legislation benefitting defendant
Bravo, the fact that defendant Bravo and defendant Martinez were
not friends predating defendant Martinez's election to the Senate
and appointment as Chair of the Public Safety Committee, and

evidence that one of defendant Bravo's friends, Jose ("Pepe")
Llama, testified before a grand jury that he was aware that
defendant Bravo was going to Las Vegas with a "political group" –
specifically, with two senators. (Docket No. 359 at 150-152, 158-
159; Docket No. 372 at 32-33; Docket No. 389 at 80-81; Gov't.
Exhibit 107). The defendants' various theories about how defendant
Martinez ended up going to the Las Vegas trip at the last minute
due to a gracious gesture on the part of defendant Bravo are not
supported by cites to the record, and in fact, were never confirmed
by evidence presented at trial. Thus, because the Rule 29 standard
requires the Court to consider the evidence "in the light most
favorable to the prosecution", it is certainly reasonable that the
jury determined from the circumstantial evidence presented at trial
that defendants Bravo and Martinez acted with corrupt intent with
respect to the Las Vegas trip and the official acts taken with
respect to Senate Projects 410 and 471. See Lara, 181 F.3d at 200
(1st Cir. 1999).

Next, defendants argue that they were improperly
convicted of violating section 666 based on an impermissible
gratuities theory. Defendants characterize this as an "error as a
matter of law", which, as the government points out, is not an
appropriate subject matter for a Rule 29 motion. Defendants allege
(1) that the government shifted its theory from one of bribery and
quid pro quo to one of a "reward" theory during the government's

rebuttal to closing arguments and (2) that the Court's jury instructions allowed the jury to convict defendants improperly based on a gratuities theory.  (Docket No. 450 at 11 & 449 at 19.) Defendants place an inordinate amount of emphasis on the use of the word "reward" in both of these contexts, but fail to acknowledge that this word is part of the explicit language of the statute. Defendants Bravo and Martinez were appropriately convicted of federal programs bribery in violation of section 666; the Court's explanation of the statute in its instructions to the jury was perfectly in line with the explicit language of the statute.  The Court finds defendants' argument regarding the basis of their conviction to be without merit.  Thus, defendants' motion for acquittal as to the section 666 conviction is **DENIED.**

### CONCLUSION

Based on the foregoing analysis, the Court **GRANTS** defendant Bravo's Rule 29 motion for judgment of acquittal as to Count Two, **DENIES** defendant Bravo's Rule 29 motion for judgment as to Counts One and Four, and **DENIES** defendant Martinez's Rule 29 motion for judgment of acquittal as to Count Five.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, December 12, 2011.

s/ Francisco A. Besosa
FRANCISCO A. BESOSA
UNITED STATES DISTRICT JUDGE